LOTTINGER, Judge.
The trial judge disposed of this matter in the following manner:
“Plaintiff brings this suit seeking the recovery of $934.20 as a balance on an open account for goods, wares and merchandise consisting of moving picture equipment, sold by the plaintiff to the defendant, and particularly described in an itemized statement of the account annexed to the petition.
“Defendant in answer denied that he owed the account, and further set forth that, being desirous of purchasing certain equipment for a theatre which he owned in Franklinton, Louisiana, he went to the plaintiff concern and bought the equipment on the recommendation of the employees of the plaintiff, who are experts in the theatre field; that the said equipment was installed by the plaintiff’s employee, and after a trial of same it was found unfit for the purpose intended, because it would not reflect and project moving pictures as they should have been reflected and projected. In other words, the defendant seeks the avoidance of the sale on account of vices or defects in the equipment sold.
“The facts in this case show that sometime prior to March 15, 1955, the defendant had operated a moving picture theatre in the town of Franklinton off and on for maybe a year or two, however, a year prior to entering into a contract for the purchase of the equipment which is the basis of this suit, the theatre had been rented to a man by the name of Welch and had not been in operation; apparently Welch’s lease had expired and the defendant, again intending to go into the motion picture business for himself, went to New Orleans and talked to the President of the plaintiff concern relative to the type equipment which he should install to show the best pictures.
“The evidence shows that the old screen which was in the defendant’s theatre was ten feet high by thirteen and a half feet long, and that prior to the time the defendant went to New Orleans to enter into the contract for the purchase of the equipment, the plaintiff’s Engineer, Mr. Ballam, measured the width of the stage of the defendant’s building and found it would accommodate a screen twenty-two feet in width. In the conversation which the defendant had with the plaintiff’s President, Mr. Hodges, it is obvious that what the defendant desired to purchase was a screen for cinemascope pictures. This is apparent from the testimony, not only of the plaintiff’s President, Mr. Hodges, but from the contract which the defendant signed for the purchase of the equipment. This contract is in the record and marked for identification ‘P-12,’ and the fourth item on said contract which the defendant agreed to purchase were to Bausch & Lomb anamorphic attachments. The evidence shows that the only way that a cinemascope picture can be shown is with anamorphic attachments. While it is true the anamorphic attachments were not shipped to the defendant immediately, because of the fact, as reflected by the evidence, he had not made arrangements to obtain the cinema-scope pictures, yet it is apparent that he had in mind showing this type picture at a subsequent date. The evidence shows that the stage in the defendant’s theatre would not accommodate a wider screen than twenty-two feet and that the proper ratio for the showing of cinemascope pictures between the width and length of the screen is about two to one, accordingly, Mr. Hodges, the plaintiff’s President, recommended a screen twenty-two feet in width by ten feet six inches in height, and ac *91 cordingly furnished this size screen to the defendant. Of course, it was not the intention of either of the parties that the defendant would show nothing but cinema-scope pictures, for as I understand it, a man could not operate a show successfully by showing only this type picture, because he would not be able to get a sufficient number of them, and if he could, the cost would no doubt he prohibitive in a small town for showing them regularly. So, in order to compensate for this factor, it has been necessary for the furnishers of moving picture screens to make one that will not only suffice for the cinemascope picture, but for the old wide, or 2-D, pictures as well. In order to show these old pictures on the cinemascope screen, it is necessary to decrease the width of the picture in order to make it fit a screen ten and a half feet in height. This is done by increasing the size of the projection lens, and also with adjustment of the aperture plates. The plaintiff concern furnished the defendant with Wollensak projection lens, and I am satisfied from the testimony that these lens, with proper adjustment, would project a picture seventeen and a half feet in width and the proper length for the screen, provided the picture was one of the newer type pictures. However, if the picture was a 2-D, or a real old picture, such as a Western, and was even larger as to height, while it would fit this screen in so far as the width was concerned, the effect on the screen of this type picture would be that a part of the face and the feet of the actor would be deleted from the picture. This, of course, could be remedied to a certain extent by dropping the picture and deleting more of the feet and thus seeing more of the face and head of the actor, or by adjustment of the aperture plates, to make the picture smaller, and thereby include the whole of said picture. Thus, it is apparent that in the moving picture field there are pictures of three sizes, and it is not an easy matter for a person to successfully carry on a movie operation with one screen, unless the operator of the equipment is proficient in his field. The testimony in this record reflects that the defendant did not have an operator of his picture show that knew how to make the necessary adjustments with the projector, such as framing in order to drop the picture, or to increase the size of the aperture plates in order to reduce the size of the picture, and I am of the opinion that this is what caused the defendant’s trouble with his picture, rather than any defect in the screen or the other equipment that was sold to him. Of course, the testimony of Mr. Hodges, the President of the plaintiff concern, shows that in a small town it would be prohibitive to use a different lens for each different type film shown, and that the type lens he furnished would show all type pictures on the screen furnished with certain operative adjustments.
“After the defendant attempted to operate the show with the screen and lens that were furnished by the plaintiff, and according to his testimony, he was unable to do so successfully, he purchased another screen and other projection lens from the Southeastern Theatre Supply Co. This screen, as is shown by the testimony of Mr. Gre-million, who installed it, and who was produced as a witness by the defendant, was twenty-two feet wide by fourteen feet in height, and the old type, or 2-D picture, will fit on this screen without the head or feet of the actor being deleted from the picture. His testimony further shows that this new screen as furnished by the Southeastern Theatre Supply Co. was no different for the purpose of projecting the picture on the screen from that furnished by the plaintiff. In other words, it is apparent from Gremillion’s testimony, that had he known, as did Mr. Hodges, that the defendant was going to show cinemascope pictures in his theatre, he would have furnished the same size screen as did Mr. Hodges, the President of the plaintiff concern. Mr. Gremillion’s testimony also shows, however, even though it is possible to use the size screen furnished by Southeastern Theatre Supply' Co. for cinemascope, it is not recommended by the movie industry for cine- *92 mascope, for the reason that there will he a blank space at the top and bottom of this screen when cinemascope is shown. Apparently at the time Mr. Gremillion installed this screen he was not told by the defendant that he was going- to use cine-mascope in his theatre, for I note his answer to a question on page No. 66 of the transcript as follows:
“ ‘Q. If, when you sold this screen to them you knew at that time they were going to install cinemascope, or it was contemplated they would, you would have kept the size screen that Mr. Hodges had in there, because otherwise, when you changed from 2-D, or wide arrangement to Cine-mascope, you had to decrease the height of the picture, which is against the recommendations of the motion picture industry? A. That is correct.’
“I am of the further opinion that after a careful reading of all the testimony in this record that the size screen that was furnished is the proper size screen for the purpose of showing all type pictures and consequently, it was fit for the purpose intended. I further feel that with the projection lens furnished, together with the other equipment, if the defendant had had an efficient operator, all types of pictures could have been successfully shown on this screen.
“I am further satisfied from the testimony in this record that all the materials were furnished to the defendant as shown on the itemized statement of the account and that he was given proper credits for materials that were returned by him, as well as credit for the amount of $150.00 which he paid at the time of the signing of the contract.
“I also feel that the charge of $50.-00 for engineering services in connection with the installation of the equipment was reasonable, for the plaintiff’s Engineer Ballam, came from New Orleans to Frank-linton and spent three days in said installation.
“Accordingly, for the above reasons, I will sign a judgment when presented to me in favor of the plaintiff and against the defendant in the amount prayed for.”
A careful review of the record fails to disclose any manifest error in either the legal or factual conclusions of the trial court and for that reason the judgment appealed from is affirmed.
Judgment affirmed.